IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| PAULETTE AYERS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    Civ. No. 05-129-SLR |
| | ) |
| JO ANNE B. BARNHART, | ) |
| COMMISSIONER, SOCIAL SECURITY | ) |
| ADMINISTRATION, | ) |
| | ) |
| Defendant. | ) |

John S. Grady, Esquire of Grady & Hampton, LLC, Dover, Delaware.
Counsel for Plaintiff.

Colm F. Connolly, United States Attorney and Joyce M. Gordon
Special Assistant United States Attorney, United States
Attorney's Office, Wilmington, Delaware.   Counsel for Defendant.
Of Counsel:  Donna L. Calvert, Regional Chief Counsel Social
Security Administration and Robert W. Flynn, Assistant Regional
Counsel Social Security Administration, Philadelphia,
Pennsylvania.

**MEMORANDUM OPINION**

Dated:  September 29 , 2006
Wilmington, Delaware

ROBINSON, Chief Judge

## I.    INTRODUCTION

Plaintiff Paulette Ayers ("plaintiff") filed this action against defendant Jo Anne B. Barnhart, Commissioner of Social Security ("defendant"), on March 4, 2005.  (D.I. 2)  Plaintiff seeks judicial review, pursuant to 42 U.S.C. § 405(g), of a decision by defendant denying her claim for disability income benefits under § 216(i) of the Social Security Act.  (Id.) Currently before the court are the parties' cross motions for summary judgment.  (D.I. 13, 17)  For the reasons stated below, the court will deny defendant's motion, deny plaintiff's motion, and remand for further proceedings.

## II.    BACKGROUND

### A.    Procedural Background

On May 6, 2003, plaintiff filed an application for disability insurance benefits claiming disability since June 2, 2002.  (D.I. 11 at 58-60)  Plaintiff claimed back strain/sprain causing pain and her inability to lift or bend.  (Id. at 66)  The claim was denied initially and upon review because it was determined that her ailments were not severe enough to keep plaintiff from working.  (Id. at 53, 43)  Plaintiff requested a hearing before an administrative law judge ("ALJ").  (Id. at 48) The hearing was held on November 3, 2004.  (Id. at 14)  On November 18, 2004, the ALJ denied plaintiff's claim.  (Id. at 25) The ALJ found the following:

1.  The claimant meets the nondisability requirements for a
    period of disability and Disability Insurance Benefits
    set forth in Section 216(i) of the Social Security Act
    and is insured for benefits through the date of this
    decision.
2.  The claimant has not engaged in substantial gainful
    activity since the alleged onset of disability.
3.  The claimant's degenerative disc disease and depression
    are considered "severe" based on the requirements in
    the Regulations 20 CFR § 404.1520(c).
4.  These medically determinable impairments do not meet or
    medically equal one of the listed impairments in
    Appendix 1, Subpart P, Regulation No. 4.
5.  The undersigned finds the claimant's allegations
    regarding her limitations are not totally credible for
    the reasons set forth in the body of the decision.
6.  The claimant has the residual functional capacity to
    perform a significant range of light work.  The
    claimant is limited to low stress, simple, routine,
    unskilled work that has a sit-stand option and requires
    only low concentration and memory.  The claimant is
    able to understand simple instructions, attend
    schedules and complete tasks.  The claimant must avoid
    climbing, balancing, stooping, temperature extremes and
    humidity.
7.  The claimant is unable to perform any of her past
    relevant work (20 CFR § 404.1565).
8.  The claimant is a "younger individual between the ages
    of 18 and 44" (20 CFR § 404.1563).
9.  The claimant has a "high school (or high school
    equivalent) education" (20 CFR § 404.1564).
10. The claimant has no transferable skills from any past
    relevant work and/or transferability of skills is not
    an issue in this case (20 CFR § 404.1568).
11. The claimant has the residual functional capacity to
    perform a significant range of light work (20 CFR
    § 404.1567).
12. Although the claimant's exertional limitations do not
    allow her to perform the full range of light work,
    using Medical-Vocational Rule 202.21 as a framework for
    decision-making, there are a significant number of jobs
    in the national economy that she could perform.
    Examples of such jobs include work as attendant,
    cashier, interviewer/surveyor or order clerk.
13. The claimant was not under a "disability," as defined
    in the Social Security Act, at any time through the
    date of this decision (20 CFR § 404.1520(g)).

2

(Id. at 23-24) On February 4, 2005, the Appeals Council declined
to review the ALJ's decision and his decision became the final
decision of the Commissioner. (Id. at 5)

**B. Plaintiff's Written Submissions to SSA**

On May 6, 2003, plaintiff submitted an application for
Disability Insurance Benefits in which she indicated that she had
been unable to work since June 2, 2002 because of her disabling
condition. (D.I. 11 at 58) Also on May 6, 2003, plaintiff
submitted an Adult Disability Report in which she claimed that,
as a result of back strain/sprain and limited lifting and
bending, she could not work. (Id. at 66)

On August 12, 2003, plaintiff completed a Disability
Determination Services Daily Activities Questionnaire. (Id. at
99-106) In that questionnaire, plaintiff represented that she
hurt herself while on the job at the Stokely Center and lost that
employment because she was unable to perform her duties.
Plaintiff described her typical day as usually spent at home.
Although she has a driver's license and can operate a car,
plaintiff stated that activities outside the home are limited and
at times she needs help getting to and from places due to the
severity of her pain. She prepares meals, but admitted that she
was never a cook and mainly prepares "TV Dinner[s] or something
easy." She cooks only three times a week and depends on
neighbors to help prepare meals. Plaintiff stated that she does

3

household chores, but has help with cleaning. Specifically, her "oldest daughter comes to the house" and helps in that regard. Plaintiff reported that she does grocery shop three times a month "or whenever I need something;" either her aunt or daughter take her food shopping or she drives herself. She noted that she needs help carrying grocery bags and lifting items. Plaintiff claimed that she can pay bills and deal with her bank accounts and/or insurance claims without assistance. (Id.)

Outside activities are limited because she "can't stand the sun because of [her] high blood pressure [medication]." She often reads and watches news and talk shows "off [and] on through out the day." Plaintiff periodically visits friends and relatives; but explained that she does not need assistance to visit since she only goes "down the street." Plaintiff described herself as a "loner," and as having limited telephone contact with family and friends. (Id.)

Plaintiff also reported that she cares for, feeds, and dresses a handicapped dependent daughter "with help from [her] extended family." Plaintiff stated that her 17 year old son lives with her as well. Plaintiff claimed that she did not need assistance with her personal care, such as, grooming, dressing, bathing and the like. (Id.)

Plaintiff noted difficulty with sleeping, for which medication is prescribed. She listed a number of prescriptions,

4

including Zoloft, Darvon, Lexapro, Flexeril, Bextra and Skelaxin. She reported side effects from those medications, including intolerance to heat or sun, dizziness, fatigue, restlessness and problems with her vision. (Id.)

Concerning the effect of the injury on her ability to cook, shop, handle finances, or perform household chores, plaintiff stated that she "couldn't do much at all in the beginning the things I did before are limit[ed] as I can't do a lot [of] thing[s] since my injury." She reported no recreational activities or hobbies. Regarding whether she experienced any difficulty with comprehension or memory, plaintiff explained: "[S]ometimes I just forget things then I think about and then it comes back to me later." (Id.)

Plaintiff did not require help to complete the Daily Activities Questionnaire. (Id.)

## C. Facts Evinced At The Administrative Law Hearing

Plaintiff is a 45 year old female who is five feet six inches tall and weighs one hundred forty pounds, having lost approximately thirty pounds since she stopped working. (D.I. 11 at 303, 318-19) Plaintiff has a 22 year old daughter who is disabled and resides with plaintiff. (Id. at 319) Plaintiff's daughter is unable to walk or talk and is confined to a wheelchair. (Id. at 307, 319) Plaintiff has a high school education and, for at least fifteen years prior to June 2002, she

5

was employed as an attendant at the Stokely Center. Her duties
at Stokely required lifting patients and, therefore, included
heavy lifting. Plaintiff testified that she originally injured
her back on June 2, 2002 while turning a patient, and reinjured
that area on July 4, 2002 while bending forward. Plaintiff did
not return to work at Stokely following the initial injury,
however, she earned some income in 2003 from babysitting her
grandchildren. According to plaintiff, babysitting did not
require any lifting since her grandchildren were 4 and 5 years
old. (Id. at 303-307)

Plaintiff testified about problems with, and treatment and
medications related to, her back, feet, hands, and depression.
Plaintiff testified that she treated with Dr. Robert M. Wilson
immediately following her back injury through the date of the
hearing. Dr. Wilson's treatment involved "[n]eedles . . . heat
. . . and cold compresses." (Id. at 304-306) She confirmed that
she suffers from daily back pain for which she had been
prescribed Bextra. Shortly before the hearing, Dr. Wilson
changed her pain prescription to Celebrex. Although that
mediation relieves her pain, it makes her sleepy. Plaintiff also
alluded to other pain medication prescribed by Dr. Wilson and
reported that those prescriptions alleviate her pain for an
entire day. (Id. at 309) Plaintiff explained that "[a]t first
[her medications] made [her] drowsy and stuff . . . [but] when

6

[she] got used to it, [she] was all right." (Id. at 316)

Plaintiff also claimed that she had problems with her feet due to arthritis and heel spurs. She was treated by Dr. Edwin M. Mow for her foot problems with "needles for pain" and had surgery on her left foot. She noted suffering from pain in her right foot. (Id. at 306-307) For pain relief, plaintiff soaks her feet in water with Epsom salt daily for a short period of time. (Id. at 309-310)

Plaintiff testified that she has arthritis in her hands and her "knuckles hurt real bad." As a result, her hands occasionally swell. No medication is prescribed for that condition, but plaintiff uses ice, as instructed by her physicians, to alleviate the swelling. (Id. at 320-321)

With regard to her mental health, plaintiff testified that she suffers from depression and is in therapy, but was previously able to work despite her depression. (Id. at 308) For the depression, she presently is under the care of Dr. Nathan L. Centers, a psychiatrist, and Kathy, a therapist who works with Dr. Centers. Plaintiff has been under Dr. Centers' care for approximately one year and her office visits with him are monthly. Previously, plaintiff treated with Mona Volante, a psychotherapist, with twice weekly therapy visits. Per Dr. Centers' prescription, plaintiff takes Lexapro, which she reported as helping the depression. Before Lexapro, plaintiff

7

was prescribed Prozac, then Zoloft for that condition. She testified that she also meditates which alleviates the depression. (Id. at 317, 328-331)

Plaintiff testified that she takes Ativan for anxiety. (Id. at 316, 330) According to plaintiff, she gets upset with herself because she worked all her life and now she "can't hardly take care of my own [daughter]." (Id. at 317) She reported difficulty with sleeping and takes medication for that problem. She is also prescribed Prevacid for heartburn relief. (Id. at 316-317)

Concerning her daily activities, plaintiff stated that she used to, and still tries to, do crafts. She usually sits and watches television. On good days, she is also able to stand and wash the dishes. Plaintiff can grocery shop, does not have problems loading the basket, and can walk the aisles. Because she is familiar with the layout of the store, generally, it does not take her long to grocery shop. She avoids bending down due to pain. (Id. at 312, 314-316) Plaintiff also testified that she goes to church every Sunday. (Id. at 321)

Plaintiff reported that, as a result of her problems with her feet, she cannot tolerate standing for long periods. (Id. at 307) Although she once used a cane for walking, she stopped because people "laughed at me," but she walks "on my tiptoes when my feet hurt real bad." (Id. at 313-14) Plaintiff related

8

problems with sitting, which require her to alternate between sitting and lying on her side. Although caring for her handicapped daughter requires her to engage in painful movements, she is able to lie down a "[l]ittle bit" during the day. Plaintiff claimed that she "can't lift at all," and needs help with lifting her daughter. (Id. at 307-308) Her daily routine includes rising at 6:00 a.m., getting her daughter up, dressing herself and her daughter, and having breakfast. After breakfast, plaintiff related that she stays at home, since she no longer has a car. (Id. at 311)

Plaintiff testified that she has good and bad days. Her bad days occur more than once a week. On bad days, she feels terrible, stays indoors, cannot do crafts, and has no contact with others for three or four days. She uses a heating pad and hot water bottles, takes medicine, and stays in bed to relieve her back pain. (Id. at 311-313) On bad days, she uses a chair with wheels to maneuver around her home and wash dishes. (Id. at 315)

Plaintiff believes that she could not work forty hours a week at an "easy job," because of her daily pain. Since she had never been fired, she did not want this to occur due to absenteeism. (Id. at 311) Plaintiff did not feel that she could tolerate a desk job because of pain. (Id. at 314-15) Plaintiff also testified that she could not lift 20 pounds, but did not

9

directly answer whether she could lift 10 pounds. (Id. at 320)

Plaintiff's sister, Fay Smith, testified at the administrative hearing. Smith confirmed that plaintiff lives near her, that they often visited each other, that plaintiff came out "maybe several times a week," and that she regularly attended church. Regarding plaintiff's physical complaints, Smith related that plaintiff suffered from frequent severe back pain and has arthritis in her back, feet, and fingers. (Id. at 323-325)

Smith described plaintiff's back pain as evidenced by the way she walks ("some days like an old woman . . . stooped over"), how plaintiff sits ("she doesn't sit all the way back. She may have to have a pillow on her back, or she'll lean to the side."), and the need to move from a seated position (because it "causes . . . more pain in her back. She's got to more or less stand up and move around a little so she doesn't tighten up."). Smith reported that plaintiff frequently lies on the sofa, with or without her feet propped, complaining of back and foot pain. Smith testified that plaintiff's back pain is a regular occurrence, and "not a once in a while thing." (Id. at 323-326)

Smith confirmed that plaintiff receives injections for foot pain, and has observed swelling in plaintiff's feet which requires her often to wear slippers rather than shoes. Smith testified that plaintiff related that she has arthritis in her fingers and that her hands hurt a lot. When visiting, Smith has

10

not observed plaintiff cleaning ("[s]he might dust a little bit,
but I mean as far physical work, she can't . . . [b]ecause of
the pain"). Smith is aware of plaintiff's depression as
evidenced by her appearance, whether she responds to phone calls,
or leaves the house. Smith knows that plaintiff takes medication
for depression. (Id. at 323-327)

## D. Vocational Evidence

During the administrative hearing, the ALJ called a
vocational expert, Arthur M. Brown, to testify, and asked him the
following hypothetical question:

> [A] person who's 43 years of age on her . . . onset date. .
> . . Has a twelfth-grade education, the past relevant work
> as indicated . . . [who is] right handed by nature. . . .
> Suffering from the effects of degenerative disc disease with
> some arthritis attached. And some depression, occasional
> mood swing. This does cause her to have some pain and
> discomfort in her feet and back, somewhat relieved by her
> medications, however, without significant side effects. But
> she tells me she gets some sleepiness at first, whatever
> that means. . . . And would need jobs . . . that would
> allow her to sit, stand every 30 minutes if she needed it.
> Four or five minutes or whatever she needed. Low-stress
> jobs, low concentration, low memory. Simple, routine,
> unskilled job due to depression and pain. She's able to
> understand simple instructions, and she can attend
> schedules, and complete tasks. Avoid climbing, balancing,
> and stooping, temperature and humidity extremes. And jobs
> that allow her to ambulate to the workplace with her cane if
> needed. But would be able to do the framework of sedentary
> and light work activities. Would there be jobs out there in
> the national economy in significant numbers such a person
> could do, in your opinion as a vocational expert?

(D.I. 11 at 332-333) Brown testified that jobs existed, such as
restroom/locker room attendants, light cashier positions (for
example, gasoline service attendant), and interviewers or survey

11

workers, that are at the light exertional level.  Brown also
testified that clerical jobs, such as order clerks, telephone
clerks, charge account clerks, and ticket sellers, would permit
sitting and standing and are sedentary positions.  (Id. at 333-
335)

Plaintiff's attorney asked Brown, " [I]f you assume that
[plaintiff's] testimony as you heard today was credible, would
you agree there'd be no jobs available for her within the
economy?"  (Id. at 336)  Brown agreed, "[T]hat would be correct."
(Id.)  Plaintiff's attorney then asked:

> [I]f you assume the facts that the judge gave you.  And if
> you also assume that, because of pain and depression,
> [plaintiff] one day a week would not be able to work, would
> you agree also with that hypothetical there wouldn't be any
> jobs available for her in the economy on an everyday basis?

(Id.)  Brown responded that "if a person misses work one day a
week on an unscheduled basis, then the person would exceed what
would be considered normal work tolerances."  (Id.)

## E.   Medical Evidence

Plaintiff was initially seen by her primary treating
physician, Dr. Robert M. Wilson, on June 5, 2002, three days
following her injury at work.  Dr. Wilson's records for that
office visit indicate that plaintiff hurt her back transporting a
patient and that she complained of low back pain following that
incident.  Dr. Wilson's diagnosis was lumbar sprain/strain.  He
injected 1cc of Kenalog 40 mg and 1cc 1% Lidocaine in the left

12

superior sacroiliac ("SI") joint region; prescribed Bextra 20 mg daily; and instructed moist heat to be used twice daily as needed for pain. (Id. at 261)

On June 24, plaintiff was rechecked by Dr. Wilson for her lumbar sprain/strain. At that office visit, another injection was administered to plaintiff's left superior SI joint region. Plaintiff was instructed to continue with the moist heat and Bextra, and to start taking two Skelaxin 400 mg at night. (Id. at 260)

Plaintiff returned to Dr. Wilson on July 11, complaining of injuring the right side of her back while lifting a bag of charcoal. His diagnosis was right SI joint sprain/strain and he injected plaintiff's right superior SI joint region. Plaintiff was advised to continue with Bextra, to increase Skelaxin to three times daily, and to continue moist heat twice daily as needed for pain. (Id. at 259)

At her July 25 office visit, plaintiff again reported continuing low back pain. Dr. Wilson diagnosed right SI joint strain/sprain and lumbar strain/sprain and he administered another injection to plaintiff's right superior SI joint region. Plaintiff was instructed to use moist heat twice daily as needed for pain. (Id. at 258)

On August 2, plaintiff was seen for a recheck. Dr. Wilson's records reflect symptoms of depression and he prescribed

13

"continued use" of Zoloft 100 mg daily.[1] (Id. at 257)

On August 22, plaintiff returned to Dr. Wilson for manipulation of her back, which procedure was continued at subsequent visits. The record notes muscle spasm on the right L1-L5; limited range of motion ("LROM") of the lumbar spine; and lumbar strain/sprain. Plaintiff was instructed to use moist heat twice daily as needed for pain and to take one Bextra 10 mg twice daily. (Id. at 256)

Plaintiff was seen by Dr. Wilson on September 26 with complaints of low back pain. Muscle spasm of the right L1-L5 with LROM and the same diagnosis was noted. Dr. Wilson manipulated plaintiff's back and again prescribed moist heat twice daily as needed for pain and to continue the current treatment regimen. (Id. at 255)

Plaintiff was next seen by Dr. Wilson on November 12 for manipulation of her back. At that time, she complained of extreme low back pain, radiating down both legs. Plaintiff reported that she was unable to lift anything because of severe pain. Muscle spasm on the right L1-L5 was again noted, along with LROM. Plaintiff was diagnosed with lumbar osteoarthritis ("OA"); lumbar degenerative disc disease ("DDD"); and lumbar

---

[1] The records provided from Dr. Wilson do not reflect when he originally prescribed Zoloft for depression. His records indicate that prior to her back injury, he prescribed Zoloft in May 2002. (Id. at 262)

14

herniated nucleus pulposus ("HNP"). Dr. Wilson prescribed an MRI of her lumbar spine and x-rays of her cervical and lumbar spine. Plaintiff was instructed to apply moist heat twice daily as needed for pain and to continue the current treatment regimen. (Id. at 254)

A November 15, 2002 MRI report, authored by Dr. Robert J. Varipapa, recited the impression of "[m]ild disk protrusion, L4/5, paracentrally to the right, with mild effacement of the thecal sac." No lumbar stenosis was suspected, and careful clinical assessment for associated radiculopathy was suggested. (Id. at 270)

A November 17, 2002 radiology report by Dr. Edward J. Goldstein found that x-rays of plaintiff's cervical spine were normal, but her lumbar spine showed "[m]inimal degenerative changes . . . present at the posterior elements at the lower lumbar spine." (Id. at 269)

Plaintiff underwent another manipulation of her back by Dr. Wilson on December 27, 2002. She reported having considerable pain on a daily basis; the manipulations, while helpful, lasted only approximately two weeks. The office notes report LROM of the lumbar spine and muscle spasm on the right L1-L5. Dr. Wilson's diagnosis remained as lumbar strain/sprain and he continued with the moist heat, Bextra 20 mg daily, and one Skelaxin 800 mg three times daily as needed for spasm. (Id. at

253)  The same findings were made and the same treatment was
prescribed as a result of plaintiff's office visit with Dr.
Wilson on January 14, 2003.  (Id. at 252)

On January 24, 2003, Dr. Wilson wrote a letter advising that
he immediately placed plaintiff out of work after her job injury.
He reported that his treatment included medication and exercises
"and nothing has helped her."  The letter notes that plaintiff
"is now experiencing problems with her neck and I do not want her
to return to work."  Dr. Wilson reported that plaintiff had not
improved since August of 2002; that she "has many problems with
her lower back that were confirmed by [her] recent MRI"; and
opined that further damage to plaintiff's spine could occur if
she lifts or pulls any amount of weight.  (Id. at 251)

On February 6, 2003, Dr. Dewey A. Nelson examined plaintiff
and sent a report dated February 11, 2003 to State of Delaware
State Board of Pension Trustees and Office of Pensions.  (Id. at
115-118)  Dr. Nelson noted that plaintiff complained of low back
pain; occasional pain in the right leg; lumbar spasms, and
recently-developed thoracic and cervical spasms.  Plaintiff
reported taking Zoloft for depression.  (Id.)

Dr. Nelson reflected that the results of plaintiff's MRI
showed a mild protrusion L4-L5 paracentrally to the right which
raises the possibility of L5 root syndrome.  In the "Discussion"
section of the report, however, Dr. Nelson concluded that "[t]his

16

patient has no neurological signs and this tends to rule out spinal cord, nerve root or peripheral nerve disease. I do not believe the patient has any evidence of lumbar radiculopathy." (Id.)

Dr. Nelson further reported that plaintiff's November 17, 2002 x-rays showed "minimal degenerative changes at the posterior elements at the lower lumbar spine." Dr. Nelson was aware of Dr. Wilson's treatment and regimen of medications. (Id.) He found that plaintiff's "[g]eneral appearance was abnormal because she walked very slowly with a forward flexed bodily attitude. Romberg was negative." He determined that plaintiff had good orientation to time, place, and person, and that memory of recent and remote events was good. On examination, "[t]here was severe pain on straight leg raising with the patient recumbent but she could sit easily over the ledge in the sitting lumbar root test. Patrick's sign was difficult to test because of patient's complaints of pain when the legs were moved." The "Discussion" portion of the report recited:

Because of the extreme pain that the patient voices[,] and because of her good work history in the past, one would like to rule out an organic condition such as lumbosacral strain or distraction of the lumbosacral joints, right or left, probably right. Patrick's sign is unreliable because of the patient's complaints of spas[m] but it would be worthwhile to obtain a copy of Dr. Sabbaugh's pending consultation that will be performed in a few days. I believe the routine positioning views for sacroiliac joint should be performed, along with bone scan. Because the patient has a long history of severe home stress requiring

17

psychological counseling and psychotrophic medications
in the past, with the Zoloft therapy continuing, I
believe a psychiatric consultation would be valuable in
enlarging our knowledge of this severe, persisting low
back pain.  It is possible the low back strain that
occurred on 06-02-02 was only a trigger mechanism of an
underlying major depression that goes back many
years[,] as indicated by her history.

(Id.)  Dr Nelson's impression was:

1.  Low back pain unknown etiology that occurred during
lifting a client on 06-2-02
2.  Sacroiliac strain or separation should be ruled out
by orthopedic consultation, usual radiographic views
and bone scan
3.  Depressive illness for many years requiring Zoloft
therapy intermittently
4.  I suspect that one of the major contributions to
her pain is a depression with somatic features of back
pain

I believe with additional information it will be
possible to give a more expert opinion as to whether or
not this patient can return to her previous employment
as "certified nursing assistant."  [Plaintiff] was most
polite and cooperative during the entire history taking
and neurological examination and one is impressed by
her good past work history before the lifting incident
in question.

(Id. at 118)

Plaintiff returned to Dr. Wilson's office for manipulation
of her back on February 10, March 4, 21, and April 1, 11, 17, 23,
30, 2003.  The treatment reports from this time period each
diagnose thoracic strain/sprain or lumbar strain/sprain and/or
lumbar DDD, lumbar HNP, and lumbar OA with radiculopathy.  (Id.
at 242-250)  Each treatment report noted LROM of plaintiff's
thoracic or lumbar spine.  (Id. at 242-250)  Plaintiff was
consistently instructed to use moist heat twice daily as needed

18

for pain, with the non-specific note to "[c]ontinue current treatment regimen" recited in several of the treatment notes. (Id. at 242-250) Muscle spasm on the right T4-T12 was noted on February 10 and muscle spasm on the right L1-L5 was noted in each of the other office visits during this time period. (Id.)

During her February 10 office visit, plaintiff reported as "having a lot of mid back pain" which "[f]eels as if someone has got their fist in her back." (Id. at 250) At her April 11 office visit, plaintiff still complained of daily back pain. She also informed Dr. Wilson that she had seen a rheumatologist, Dr. Jose Pando, who "agreed that there is a problem w[ith] her back." Dr. Wilson recommended continued care with Dr. Pando. In that same office report, Dr. Wilson noted that plaintiff was out of work according to his recommendations. Depression was also noted and that plaintiff was to be seen by Dr. Shubert. (Id. at 246) At her April 23 office visit, plaintiff again stated that "she is still having a lot of pain in her back." Plaintiff's depression was again noted with instruction to continue taking 100 mg of Zoloft daily. (Id. at 243) The record of plaintiff's April 30 office visit reports that she "is still having a considerable amount of discomfort w[ith] her back. Is unable to lift anything at home." Dr. Wilson's diagnosis included lumbar OA and lumbar HNP with radiculopathy and ambulatory dysfunction. Plaintiff was instructed to continue taking Flexeril 10 mg at bedtime as

19

needed for spasm.  (Id. at 242)

Plaintiff was first seen Dr. Pando on April 10, 2003.  On
that date, plaintiff filled out a "Multi-Dimensional Health
Assessment Questionnaire" stating that she could dress herself;
tie shoelaces and do buttons; get in and out of bed; lift a full
cup or glass to her mouth; walk outdoors on flat ground; wash and
dry her entire body; bend down to pick up clothing from floor;
and turn regular faucets on and off without any difficulty.  She
could get a good night's sleep "depend[ing] on how I'm feeling."
She was unable to walk two miles; participate in sports and
games; deal with feelings of anxiety or being nervous; or deal
with feelings of depression or feeling blue.  (Id. at 125)

Dr. Pando's physical examination noted plaintiff had trigger
point tenderness in the cervical spine, occiput and in the
lumbosacral spine area; muscle spasms in the cervical area, the
supraspinatus muscles, and lumbosacral spine area; and moderate
to severe sacroiliac joint tenderness.  Plaintiff was awake,
alert and oriented; cranial nerves were grossly intact; no
neurological deficits identified; and no motor or sensory
deficits noted.  (Id. at 121-22)

Dr. Pando's impression was:  1) osteoarthritis; 2) chronic
low back pain for over a year; 3) myofascial pain that seems
moderate to severe; and 4) elements of depression.  Dr. Pando's
recommendations were to:  "1. Start Skelaxin; 2. Try Flexeril; 3.

20

I will send her to physical therapy-massage therapy to have better control of her symptoms and decrease the amount of tenderness she has. Hopefully, this will decrease her pain. 4. Start a home exercise program which is also important for her." (Id. at 122)

Dr. Pando noted plaintiff's MRI results revealed mild disc protrusion at L4-L5 to the right. He stated that "[t]his suggests a careful clinical examination to rule out neurological deficits in the L4-L5 distribution in the right side. The patient, today, had elements of muscle spasms that were in the cervical spine and lumbosacral spine. No significant radiculopathy is noticed." (Id.)

Dr. Pando saw plaintiff again on May 6 and his notes reflect that plaintiff was feeling much better as a result of physical therapy and taking Flexeril. (Id. at 120) In a letter of the same date to Dr. Wilson, Dr. Pando reported that plaintiff was doing considerably better. "The amount of articular pain and discomfort in the neck and back is significantly improved. She is very happy after completing PT and taking a short course of muscle relaxants. Overall, she seems to be improved. We'll continue with the same medications and reevaluate her condition in a few months." (Id. at 119)

Plaintiff returned to Dr. Wilson's office on May 7, 14, 21, and 27, 2003, receiving back manipulation on each visit. The

office notes from those visits again diagnose: lumbar
strain/sprain; cervical/lumbar strain/sprain; lumbar
strain/sprain and lumbar HNP; and lumbar HNP. LROM of her lumbar
spine and L1- L5 muscle spasm and LROM of her cervical spine and
muscle spasm on the right C4-C7 were noted. Moist heat as needed
for pain was again prescribed each visit. (Id. at 237-241)

Interestingly, on May 7, contrary to Dr. Pando's impression,
plaintiff reported to Dr. Wilson that she was "still having pain
every day." (Id. at 241) At that time, Dr. Wilson instructed
her to "continue to stay out of work." (Id.)[2] On May 14, she
stated that she was "under a considerable amount of stress."
(Id. at 239) On May 21, she reiterated that she was "having back
pain on a daily basis." (Id. at 238) On May 27, plaintiff again
stated she was "still having problems w[ith] her back on a daily
basis . . . [and] that all weekend she stayed in bed." (Id. at
237)

Notes from the Kent / Sussex Community Mental Health Center
("CMHC") of telephone contact with plaintiff on May 23 and May
28, 2003 reported that plaintiff indicated that she was doing
"ok." (Id. at 180, 179) A June 3, 2003 note from the same
facility recorded that plaintiff was there for a doctor's
appointment and that she was "dressed nice with hair clean and

---

[2] Also in the record is a May 7, 2003 prescription-note from
Dr. Wilson stating that plaintiff is to stay out of work
"indefinitely." (Id. at 240)

neat [and her] mood seems level." (Id. at 177)

Also on June 3, Mona Volante, a psychotherapist, sent a letter to Dorothy Clemente, Retirement Specialist, State Pension Office, stating that plaintiff "has recurring major depression. Her ongoing physical problems exacerbate her condition." (Id. at 127)

A June 3, 2003 report from plaintiff's psychiatrist, Dr. Nathan L. Centers of the CMHC, to the State Board of Pension Trustees and Office of Pensions, listed depression as the specific diagnosis responsible for plaintiff's disability; that plaintiff was not mentally able to perform the duties of her former position; and answered "NO" to whether alternate employment was possible. (Id. at 129)

On June 10, plaintiff returned to Dr. Wilson's office and received manipulation of her back. Again, lumbar strain/sprain and lumbar HNP were diagnosed and LROM of the lumbar spine and lumbar muscle spasms were noted, with instructions to apply moist heat as needed for pain. Depression was also noted, with instructions to continue the current treatment regimen. (Id. at 236)

On June 19, 2003, plaintiff arrived at the CMHC "very happy [and] smiling." Plaintiff reported that her state disability pension was approved, that she felt like a "weight [had been] lifted off her shoulders," that she would be able to pay her

bills, and "may take a vacation [with] her kids." (Id. at 174)

On June 24, plaintiff was rechecked by Dr. Wilson and she requested and received manipulation of her back. She reported still having pain on a daily basis. Dr. Wilson's diagnoses and instructions remained the same as those from plaintiff's prior visits. (Id. at 235)

Notes from a June 27 appointment at the CMHC indicate that plaintiff's energy and mood were up and that she was "doing errands [and] grocery shopping." (Id. at 172) On July 1, she expressed that her "life [was] going well . . . [r]elationship [with] boyfriend [was] more stable . . . [her] back [was] bothering her today, [and that she was] going to go home [and] rest [and] put heating pad on it to get some relief." (Id. at 171) Plaintiff was also seen on that date by Dr. Centers, whose notes reported improvement in her depressive symptoms with Zoloft and Lexapro and that no side effects from the medications were present. Dr. Centers noted plaintiff's mood "ok" and recorded Global Assessment of Functioning ("GAF") score of 65. (Id. at 185)

On July 7, plaintiff expressed to the CMHC that she had "difficulty getting up [and] going today[, that she] continues to have aches [and] pains [and was] interested in exercises/aqua therapy." (Id. at 170) On July 14, she returned to the CMHC and stated that her medications were helping with her depression.

24

Plaintiff also stated that she "has times/days [with] physical pain in back [and] shoulder joints . . . she places hot water bottle on painful locations, takes Flexeril [and] lays down." (Id. at 169)

On July 15, plaintiff was seen by Dr. Wilson for recheck and asked for and received manipulation of her back. She advised that she had been sick for three days and stayed in bed, after which she had problems with cramps in her calves. LROM in her lumbar spine and lumbar muscle spasm were again noted. Lumbar OA was diagnosed with moist heat prescribed as needed for pain. Dr. Wilson ordered an immediate venous duplex study of her calves. (Id. at 234) That study was performed on the same day and showed no signs of deep venous thrombosis. (Id. at 267)

On August 1, a doctor on behalf of the Social Security Administration completed a Physical Residual Functional Capacity Assessment of plaintiff. (Id. at 130-38) In that report, the doctor opined that plaintiff could occasionally lift 20 pounds; frequently lift 10 pounds; stand/walk for two hours in an eight-hour workday; and sit for six hours in an eight-hour workday. The doctor also determined that plaintiff could occasionally climb ramps/stairs; balance, stoop, kneel, crouch and crawl; and should avoid extreme cold and vibration. Although a box was checked "No" as to whether "a treating or examining source statement(s) regarding the claimant's physical capacities in

file," there are notations concerning plaintiff's medical history included in the report. Following those notations, the report states "[plaintiff] does have MRI; which could cause pain; [therefore] [plaintiff] is fairly credible . . . Max RFC is for sedentary esp[ecially with] lumbar pain [with] DDD and class I obesity." (Id.)

Plaintiff was seen by Dr. Wilson on August 4 and 18, 2003, and received back manipulations, diagnoses, and instructions consistent with her prior visits. (Id. at 233, 232) At the August 18 office visit, plaintiff stated that she was doing well with the back manipulations. (Id. at 232) Dr. Wilson instructed plaintiff to "continue Darvocet N 100" every four to six hours as needed for pain, in addition to the continued instructions to use moist heat as needed for pain. (Id.)

On August 18, the plaintiff was also seen by podiatrist, Dr. Edwin M. Mow, for left foot pain. Dr. Mow ordered x-rays and noted that plaintiff might need surgery on her foot. (Id. at 198)

On September 4, plaintiff returned to see Dr. Wilson for back manipulation and stated that her back had been "really bothering her" the previous week. She reported problems with her left foot; the visit with Dr. Mow; and the likely need for surgery. Diagnoses, treatment instructions, and observations of lumbar muscle spasm and LROM were again repetitious of Dr.

26

Wilson's prior office notes.  (Id. at 231)

On September 8, plaintiff returned to Dr. Mow.  His notes reflect that plaintiff's foot pain had existed for three years and that both feet were now tender.  Plaintiff indicated that Bextra helps with foot pain and that she was interested in surgery on her left great toe.  Although the record is difficult to read, it appears to note that plaintiff's daughter is disabled and in a wheel chair most of the day and that "patient has a lot of help for her daughter."  Referencing plaintiff's x-rays, Dr. Mow records that the x-rays show "acute DJD, [degenerative joint disease]" in her left foot.  (Id. at 197)  The record of plaintiff's September 9, 2003 visit to the CMHC reports that plaintiff complained of foot pain and advised of her impending surgery.  (Id. at 167)

Plaintiff was next seen by Dr. Wilson on September 16 and October 2, and received back manipulation each visit.  (Id. at 230, 229)  On September 16, the diagnosis was cervical strain/sprain, while on October 2, the diagnosis was lumbar OA and lumbar DDD with radiculopathy.  At both visits, Dr. Wilson noted LROM and muscle spasm, and continued with the same treatment.  Because plaintiff complained of increased back pain and problems with her feet, Dr. Wilson ordered x-rays of her left foot and ankle.  (Id.)

On October 19, Dr. Randy Rummler completed a statement for

27

the Delaware Disability Determination Service.   (Id. at 139-141)
The report noted plaintiff's appropriate dress and grooming;
speech as fluent; thoughts spontaneous and productive; mood
"depressed" but that she was cooperative in the interview.
Plaintiff related that she has been "always depressed" and often
"feels like staying in bed," but advised that she began to work
on crafts and that she also reads.   She explained that her
depression and stress worsened since she has been unable to work
and, previously, she did not have any specific problems at work
due to depression, or any problems with co-workers or
supervisors.   (Id.)

     Dr. Rummler's diagnoses were major depression, recurrent,
moderate; back pain and arthritis; and a GAF score of sixty.   Dr.
Rummler opined that not working "likely exacerbates [plaintiff's]
depression in intensifying the patient's feelings of lack of
usefulness."   He found plaintiff's "depressive symptoms are
moderate at best, however, although she states that her mood is
chronically depressed, she does have several activities she
engages in, and has no thoughts of self-harm."   Since Dr. Rummler
concluded that her current level of depression is not an
impairment in and of itself, he found that her depressive
symptoms would likely diminish upon returning to work.   Dr.
Rummler recommended "continued medication adjustment, as well as
supportive therapy."   (Id.)

Notes from plaintiff's October 21 appointment with Dr. Centers report that plaintiff was on medication "as per orders and reports that anxiety and depressed mood have improved. Sleep is still good and appetite as well." Plaintiff's mood was "ok"; there were no side effects from her medication; and her GAF score was seventy-five. (Id. at 164)

On October 23, Dr. Carlene Tucker-Okine completed a psychiatric report and a mental residual functional capacity assessment on plaintiff. (Id. 142-159) Dr. Okine found that plaintiff had "major depression, recurrent, moderate"; was mildly limited in activities of daily living and maintaining social functions; was moderately limited in maintaining concentration, persistence, or pace; did not have episodes of decompensation of extended duration; was moderately limited in her ability to maintain attention and concentration for extended periods and to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; and was moderately limited in ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at consistent pace without an unreasonable number and length of rest periods. (Id.)

Dr. Okine opined that plaintiff's "affective disorder appears to be secondary to her physical problem [and her activities of daily living] appear to be adequate except for

29

alleged physical limitations." From a review of plaintiff's rheumatology and CMHC records, Dr. Okine noted that she appeared to be responding well to treatment and medication. Dr. Okine wrote that plaintiff "should continue both her medication and treatment, but she appears to be able to handle routine tasks." (Id.)

An October 27 radiology report from Dr. Jeffery I. Jackerson of x-rays of plaintiff's left ankle found that there was "[n]o significant radiographic abnormality . . . identified." (Id. at 264) X-rays of plaintiff's left foot showed only "[d]egenerative changes consistent with osteoarthritis, MPJ, great toe, left foot." (Id. at 263) Dr. Mow's office notes of October 27 report pain in plaintiff's left foot and that surgery was scheduled for October 30. (Id. at 196)

Plaintiff returned to Dr. Wilson's office on October 28 for back manipulation and stated that manipulation was helping. Dr. Wilson diagnosed cervical strain/sprain and again noted LROM and cervical muscle spasm with the same continued instruction of moist heat as needed for pain. (Id. at 228)

Following surgery on her left foot, Dr. Mow's November 5 office record indicated that plaintiff was "healing nicely"; she had "much less pain"; and that she wanted surgery on her right foot in January or February 2004. Dr. Mow's November 19 record indicates plaintiff's continued improvement. (Id. at 195)

30

On November 26, 2003, plaintiff returned to Dr. Wilson and received back manipulation.  Plaintiff also asked for and received an injection to her right superior SI joint region. LROM and muscle spasm were again noted with instructions to use moist heat as needed for pain.  (Id. at 227)

On December 10, plaintiff visited Dr. Mow and reported that her left foot was still painful but that her medications were helping.  The office notes indicate that she wanted surgery on her right foot in March or April, 2004.  (Id. at 195)

On December 24, 2003, Dr. Wilson signed a physician's statement in which he recommended that plaintiff do no lifting over 10 lbs, expressing concern of reinjury at heavier weights. The statement concluded that foot problems prevented her from standing for long periods of time and that, due to her back problems, she is "limited in . . . sitting."  He opined that plaintiff could not sustain any kind of job on a regular everyday basis; and that her combined problems with her back and feet "would prevent her from doing even a sedentary job."  Dr. Wilson also noted that plaintiff's depression "would . . . interfere with her ability to concentrate at a job."  (Id. at 192-193, 273-274)

Plaintiff's next visits to Dr. Wilson were on January 6 and February 11, 2004.  On both visits, she again received back manipulations.  Dr. Wilson's office notes continue to diagnose

31

back strain/sprain, LROM and muscle spasm, and the treatment.
During the January 6 visit, Dr. Wilson also diagnosed cellulitis
of the right first toe and prescribed Keflex 500 mg three times
daily.  (Id. at 288, 289)

During her appointment with Dr. Mow on February 10, 2004,
edema/tenderness in her left great toe was recorded.  Dr. Mow
advised plaintiff to get "roomy supported shoes."  (Id. at 194,
277)

On February 18, Dr. Pedro M. Ferreira, a state agency
psychologist, reviewed plaintiff's medical records and prepared a
psychiatric report and a mental residual functional capacity
assessment, noting plaintiff's impairment as "Depression,
possible dysthymia also."  (Id. at 208-225)  He found plaintiff
mildly limited in activities of daily living and maintaining
social functioning; moderately limited in maintaining
concentration, persistence, or pace; and had no episodes of
decompensation of extended duration.  He found plaintiff to be
moderately limited in her ability to understand and remember
detailed instructions; to carry out detailed instructions; to
complete a normal workday and workweek without interruptions from
psychologically based symptoms and to perform at a consistent
pace without an unreasonable number and length of rest periods;
and to set realistic goals or make plans independently of others.
Dr. Ferreira noted plaintiff's history of "depression and

32

dysthymia primarily from experienced level of chronic pain." He
stated that plaintiff was responding well to treatment and
medication and opined that plaintiff "can participate in
employment demands of a low-stress, repetitive nature and
commensurate with prior education [and] work experience." (Id.)

On February 25, 2004, Dr. Anne C. Aldridge, another state
agency physician, reviewed plaintiff's medical records and
completed a physical residual functional capacity assessment,
determining that plaintiff could occasionally lift 20 pounds;
frequently lift 10 pounds; stand and/or walk at least two hours
in an eight hour workday; sit for about six hours in an eight
hour workday; and had unlimited push and/or pull abilities. (Id.
at 200-207) Dr. Aldridge explained those conclusions as based,
in part, upon plaintiff's lumbar MRI, showing mild disc
protrusion at L1-L5 with the nerve roots unaffected; that her
cervical MRI was normal; that plaintiff's rheumatology exam notes
showed improvement in back pain; that her podiatrist's records
noted improvement following surgery; and that plaintiff prepares
meals, shops and cares for her adult handicapped daughter. Dr.
Aldridge determined that plaintiff could occasionally climb
ramps/stairs, balance, stoop, kneel, crouch, and crawl, and
should avoid concentrated exposure to extreme cold, wetness,
vibrations, and hazards. Dr. Aldridge opined that plaintiff's
alleged subjective complaints were "somewhat disproportionate in

33

severity compared to objective findings." Dr. Aldridge answered
checked "Yes" in answer to the question "are there
treating/examining source conclusions about the claimant's
limitations or restrictions which are significantly different
from your findings," noting Dr. Wilson's December 24, 2003
opinion that plaintiff is "unable to do even a sedentary job
(opinion reserved to commissioner)." (Id.)

On March 5, radiologist Dr. Jonathan Patterson reported that
the x-rays of plaintiff's left foot revealed a spiral fracture
involving the proximal phalanx of the third digit of her left
foot. (Id. at 293) On March 11, plaintiff received back
manipulation from Dr. Wilson. The diagnoses and instructions
regarding her back problems were the same as in prior visits, and
included instructions to continue with Skelaxin and Diovan.
Plaintiff's fractured toe was noted with instructions to continue
wrapping that toe. (Id. at 287) On March 23, plaintiff saw Dr.
Mow, whose records note her fractured left toe and pain in both
her feet. Dr. Mow ordered x-rays of both feet. Dr. Mow's
records from April 8 note that plaintiff experienced significant
lessening of pain in her feet and instructed her to continue
splinting her fractured toe for three to four more weeks. (Id.
at 278)

On April 23, Dr. Wilson performed back manipulation on
plaintiff. He recorded complaints of increased back pain. He

34

also reported that plaintiff "does a lot of lifting on her mentally retarded daughter. The patient states that she does not have any help in the home, so all of her daughter's care is provided by her." Plaintiff related that she was "under a considerable amount of stress." Dr. Wilson again prescribed moist heat as needed for plaintiff's back pain and Xanax 0.25 mg twice daily as needed for anxiety. (Id. at 286)

Plaintiff saw Dr. Mow on April 29 and June 1 and the records from those visits indicate that her fractured left toe was continuing to improve. (Id. at 280) At plaintiff's June 30 visit to Dr. Wilson, she stated that "she has been having extreme pain w[ith] her back because she had missed a couple of [appointments and] was unable to get a ride to the office for manipulation." Dr. Wilson's observations, diagnoses, and instructions remained the same as those from past visits. (Id. at 285)

At her August 25, 2004 appointment for back manipulation with Dr. Wilson, plaintiff reported problems with both of her heels. She expressed that the podiatrist was not helping with her foot pain. Dr. Wilson injected plaintiff's feet, and instructed her to obtain x-rays of her right shoulder and right elbow secondary to pain. LROM of the lumbar spine was again noted, as well as muscle spasm on the right L1-L5. (Id. at 284) On August 30, plaintiff returned to Dr. Mow. Those office

35

records acknowledge Dr. Wilson's treatment of her feet five days before. Plaintiff was instructed to "try ice [and] stretching"; to "use Dr. Scholl's support"; to have physical therapy for two to three weeks; and to continue taking Bextra. (Id. at 279)

The September 30, 2004 x-ray reports of her feet, right elbow, and right shoulder found: no heel spur in her right foot, with mild degenerative changes of the first MTP; left foot as having a prominent plantar heel spur and mild degenerative changes of the big toe; and her right shoulder and right elbow were "unremarkable." (Id. at 290-91)

Plaintiff returned to Dr. Wilson's office on October 4; received back manipulation; was diagnosed with cervical strain/sprain; and instructed to continue with moist heat. She was also diagnosed with OA in both feet and prescribed Celebrex. (Id. at 283)

Records from plaintiff's November 1, 2004 visit to Dr. Mow noted that she did not attend physical therapy; that pain and tenderness in her left heel continued; and that her right heel was somewhat tender. Dr. Mow prescribed stretching and ice and instructed her to take either Bextra or Celebrex, but not both. (Id. at 281)

Dr. Mow submitted a physician's statement on November 2, 2004, reporting that he had treated plaintiff since September 2000; that she has arthritis in her feet; that on October 20,

36

2003, he operated on her left foot; and that he plans to operate on her right foot. Dr. Mow advised that plaintiff is at risk for debilitating arthritis in her feet and, due to her foot problems, she was restricted on standing and had limited weight bearing. Dr. Mow opined that her foot problems would impact her ability to work with regard to "prolonged standing, walking, [and] repeated lifting of more than 10 lbs." Dr. Mow also concluded that the usage of pain medication could alter her ability to function physically and mentally. (Id. at 282)

## III. STANDARD OF REVIEW

"The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, [are] conclusive," and the court will set aside the Commissioner's denial of plaintiff's claim only if it is "unsupported by substantial evidence." 42 U.S.C. § 405(g) (2002); 5 U.S.C. § 706(e)(E) (1999); see Monsour Med. Ctr. v. Heckler, 806 F.2d 1185, 1190 (3d Cir. 1986). As the Supreme Court has held,

> "[s]ubstantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Accordingly, it "must do more than create a suspicion of the existence of the fact to be established . . . . [I]t must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury."

Universal Camera Corp. v. NLRB, 340 U.S. 474, 477 (1951) (quoting NLRB v. Columbian Enameling & Stamping Co., 306 U.S. 292, 300

(1939)).

The Supreme Court also has embraced this as the appropriate standard for determining the availability of summary judgment pursuant to Fed. R. Civ. P. 56:

> The inquiry performed is the threshold inquiry of determining whether there is the need for a trial-whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor or either party.

> Petitioners suggest, and we agree, that this standard mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a), which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict. If reasonable minds could differ as to the import of the evidence, however, a verdict should not be directed.

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-51 (1986)

(internal citations omitted). Thus, in the context of judicial review under § 405(g),

> [a] single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence-particularly certain types of evidence (e.g., that offered by treating physicians)-or if it really constitutes not evidence but mere conclusion.

Brewster v. Heckler, 786 F.2d 581, 584 (3d Cir. 1986) (quoting Kent v. Schweiker, 710 F.2d 110, 114 (3d Cir. 1983)). Where, for example, the countervailing evidence consists primarily of the claimant's subjective complaints of disabling pain, the ALJ "must consider the subjective pain and specify his reasons for rejecting these claims and support his conclusion with medical

38

evidence in the record." Matullo v. Bowen, 926 F.2d 240, 245 (3d Cir. 1990).

## IV.  DISCUSSION

### A.  Disability Determination Process

Title II of the Social Security Act, 42 U.S.C.
§ 423(a)(1)(D), as amended, "provides for the payment of insurance benefits to persons who have contributed to the program and who suffer from a physical or mental disability." Bowen v. Yuckert, 482 U.S. 137, 140 (1987). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]"  42 U.S.C. § 423(d)(1)(A) (2002).

In Plummer v. Apfel, 186 F.3d 422 (3d Cir. 1999), the Third Circuit outlined the applicable statutory and regulatory process for determining whether a disability exists:

> In order to establish a disability under the Social Security Act, a claimant must demonstrate there is some "medically determinable basis for an impairment that prevents him from engaging in any 'substantial gainful activity' for a statutory twelve-month period." A claimant is considered unable to engage in any substantial activity "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."
>
> The Social Security Administration has promulgated

39

regulations incorporating a sequential evaluation
process for determining whether a claimant is under a
disability.  In step one, the Commissioner must
determine whether the claimant is currently engaging in
substantial gainful activity.  If the claimant is found
to be engaged in substantial activity, the disability
claim will be denied.  In step two, the Commissioner
must determine whether the claimant is suffering from a
severe impairment.  If the claimant fails to show that
her impairments are "severe", she is ineligible for
disability benefits.

        In step three, the Commissioner compares the
medical evidence of the claimant's impairment to a list
of impairments presumed severe enough to preclude any
gainful work.  If a claimant does not suffer from a
listed impairment or its equivalent, the analysis
proceeds to steps four and five.  Step four requires
the ALJ to consider whether the claimant retains the
residual functional capacity to perform her past
relevant work.  The claimant bears the burden of
demonstrating an inability to return to her past
relevant work.

        If the claimant is unable to resume her former
occupation, the evaluation moves to the final step.  At
this stage, the burden of production shifts to the
Commissioner, who must demonstrate the claimant is
capable of performing other available work in order to
deny a claim of disability.  The ALJ must show there
are other jobs existing in significant numbers in the
national economy which the claimant can perform,
consistent with her medical impairments, age,
education, past work experience, and residual
functional capacity.  The ALJ must analyze the
cumulative effect of all the claimant's impairments in
determining whether she is capable of performing work
and is not disabled.  The ALJ will often seek the
assistance of a vocational expert at this fifth step.

Id. at 427-28 (internal citations omitted).  If the ALJ finds

that a claimant is disabled or not disabled at any point in the

sequence, review does not proceed to the next step.  See 20

C.F.R. § 404.1520(a) (2002).

## B.    Application of the Five-Step Test

In the present case, steps one and two of the five-part test to determine whether a person is disabled are not at issue:    (1) the ALJ determined that plaintiff has not engaged in substantial gainful activity since the alleged onset of her disability in June 2002; (2) the ALJ qualified plaintiff's impairments as "severe" impairments.    Step three is in contention as plaintiff claims to suffer from an impairment presumed severe enough to preclude any gainful work.    Since the ALJ found otherwise, he moved to step four and found that plaintiff is unable to perform her past relevant work because it exceeds her residual functional capacity.    (D.I. 11 at 22, 24)    However, the other issue in this case concerns the fifth step:    whether or not plaintiff can perform other work existing in the national economy.    See Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993).

The ALJ found that,

> [a]lthough the [plaintiff's] exertional limitations do not allow her to perform the full range of light work, using Medical-Vocational Rule 202.21 as a framework for decision-making, there are a significant number of jobs in the national economy that she could perform. Examples of such jobs include work as attendant, cashier, interviewer/surveyor or order clerk. . . . The claimant was not under a 'disability,' as defined in the Social Security Act, at any time through the date of this decision (20 CFR § 404.1520(g)).

(Id. at 24)

Plaintiff challenges the ALJ's findings on four grounds. First, the ALJ erred in not giving great weight to the opinion of

41

Dr. Wilson. Second, and relatedly, the ALJ gave undue weight to
the opinions of physicians who completed the residual functional
capacity reports. Third, the ALJ erred in his finding that
claimant's testimony is not credible. Fourth, the vocational
expert did not rebut the ALJ's duty to demonstrate that plaintiff
was capable of performing light or sedentary work.

## C.   Weight Given to Treating Physicians

"A cardinal principle guiding disability eligibility
determinations is that the ALJ accord treating physicians'
reports great weight." Morales v. Apfel, 225 F.3d 310, 317 (3d
Cir. 2000). "Where a treating source's opinion on the nature and
severity of a claimant's impairment is 'well-supported by
medically acceptable clinical and laboratory diagnostic
techniques and is not inconsistent with the other substantial
evidence in [the claimant's] case record,' it will be given
'controlling weight.'" Fargnoli v. Massanari, 247 F.3d 34, 43
(3d Cir. 2001). "Where . . . the opinion of a treating physician
conflicts with that of a non-treating, non-examining physician,
the ALJ may choose whom to credit but 'cannot reject evidence for
no reason or for the wrong reason.'" Morales, 225 F.3d at 317
(citing Plummer v. Apfel, 186 F.3d 422, 429 (3d Cri. 1999)).
"The ALJ must consider the medical findings that support a
treating physician's opinion that the claimant is disabled." Id.
If the ALJ chooses to reject the treating physician's assessment,

42

the ALJ may not make "speculative inferences from medical reports" and may reject "a treating physician's opinion outright only on the basis of contradictory medical evidence." Plummer, 186 F.3d at 429.

Plaintiff argues that the ALJ's treatment of Dr. Wilson's report is in violation of the standards set forth in 20 C.F.R. § 404.1527, and that the ALJ should have given more weight to Dr. Wilson's opinion than to other doctors who had not examined the plaintiff. Plaintiff contends that the only reason given for rejecting the opinion of Dr. Wilson is that the ALJ must make the determination of whether plaintiff is "disabled," not Dr. Wilson. Although plaintiff does not dispute that point, she argues that the ALJ did not address Dr. Wilson's opinion on plaintiff's limitation or his overall treatment, for instance, Dr. Wilson's statement that plaintiff was limited in sitting because she needs to elevate her feet.

The court agrees that the ALJ did not adequately explain why he rejected Dr. Wilson's opinion and why more weight was given to the opinions of physicians who completed the residual functional capacity reports. Dr. Wilson saw plaintiff shortly after her June 2, 2002 injury and continued to treat plaintiff for that injury numerous times, sometimes multiple times per month as detailed above.

The Social Security regulations state that,

43

> [g]enerally, the longer a treating source has treated
> you and the more times you have been seen by a treating
> source, the more weight we will give to the source's
> medical opinion. When the treating source has seen you
> a number of times and long enough to have obtained a
> longitudinal picture of your impairment, we will give
> the source's opinion more weight than we would give it
> if it were from a nontreating source.

20 C.F.R. § 404.1527(d)(2)(i). The regulations also state that
"[g]enerally, the more consistent an opinion is with the record
as a whole, the more weight we give to that opinion." 20 C.F.R.
§ 404.1527(d)(4).

Doctors who completed plaintiff's Physical Residual
Functional Capacity Assessments on August 1, 2003 and February
25, 2005 opined that plaintiff could sometimes lift 20 pounds and
frequently lift 10 pounds. (Id. at 131, 201) The ALJ did not
articulate, however, why he apparently discounted the opinions of
Drs. Mow and Wilson that plaintiff was limited in lifting more
than 10 pounds (id. at 282, 273), as evidenced by the ALJ's
finding that plaintiff "retains the residual functional capacity
to perform a significant range of light work . . . [which]
involves lifting no more than 20 pounds at a time with frequent
lifting or carrying of objects weighing up to 10 pounds." (Id.
at 21) Indeed, Dr. Wilson opined that plaintiff "could further
damage her spine by lifting and pulling **any** amount of weight."
(Id. at 251) (emphasis added).

The ALJ noted Dr. Wilson's opinion that the combination of
plaintiff's back and foot problems would prevent her from doing

even a sedentary job on an every day basis but, apparently,
rejected that opinion because "statements that a claimant is
'disabled,' 'unable to work' can or cannot perform a past job,
. . . are not medical opinions but are administrative findings
dispositive of a case, requiring familiarity with the Regulations
and legal standards set forth therein.  Such issues are reserved
to the Commissioner . . . ."  (Id. at 19)  Having rejected Dr.
Wilson's opinion, the ALJ stated that he

> assigned significant weight to the State agency medical
> consultants' opinions with regard to the claimant's
> physical limitations . . . because they were based upon
> a thorough review of the evidence and familiarity with
> Social Security Rules and Regulations and legal
> standards set forth therein.  They are well-supported
> by the medical evidence, including the claimant's
> medical history and clinical and objective signs and
> findings as well as detailed treatment notes, which
> provides a reasonable basis for claimant's chronic
> symptoms and resulting limitations.  Moreover, their
> opinions are not inconsistent with other substantial
> evidence of record.

(Id.)  The ALJ, however, did not recite what medical evidence was
inconsistent with the opinions of Drs. Mow and Wilson which led
him to reject those opinions in favor of the opinions of the
State agency medical consultants.[3]  Here, the ALJ disregarded the
conclusions of plaintiff's treating physicians in favor of other
doctors.  "Where there is conflicting probative evidence in the

---

[3] The ALJ also did not explain why he determined that
plaintiff was able to do a significant range of light work,
thereby rejecting the State agency doctor's opinion that
plaintiff's "Max RFC is for sedentary."  (Id. at 138)

45

record, we recognize a particularly acute need for an explanation
of the reasoning behind the ALJ's conclusions, and will vacate or
remand a case where such an explanation is not provided."
Fargnoli v. Massanari, 247 F.3d 34, 42 (3d Cir. 2001). "Although
the ALJ may weigh the credibility of the evidence, he must give
some indication of the evidence that he rejects and his reason(s)
for discounting that evidence." Id. at 43. For this reason, the
court remands to the ALJ for further discussion on why, other
than familiarity with Social Security Rules and Regulations and
the legal standards set forth there, the opinions of the State
agency medical consultants were given more weight than those of
plaintiff's treating physicians.

Furthermore, the ALJ stated that there was no indication in
the medical record that the plaintiff "has or is receiving
psychological counseling for her depression even though Dr.
Rummler opined that she would benefit from supportive therapy and
that the claimant's return to work would diminish her depressive
symptoms." (Id. at 21) To the contrary, in addition to
plaintiff's testimony concerning psychological counseling (see
id. at 328-30), the record is replete with numerous references to
plaintiff's treatment at the Kent / Sussex Community Mental
Health Center (id. at 160-90); a June 3, 2003 statement from her
treating psychiatrist, Dr. Centers, which diagnosed plaintiff
with depression and found that, as a result, she was neither

46

mentally able to perform the duties of her prior employment nor any alternative employment and that vocational rehabilitation would not benefit her (id. at 129); and a letter of the same date from psychotherapist Mona Volante that plaintiff "has recurring major depression [and that] her ongoing physical problems exacerbate her condition."  (Id. at 127)

In failing to address Dr. Center's opinion, and other records from the CMHC, the ALJ did not meet his "duty to hear and evaluate all relevant evidence in order to determine whether an applicant is entitled to disability benefits."  Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981); see id. at 705 ("[W]e need from the ALJ not only an expression of the evidence s/he considered which supports the result, but also some indication of the evidence which was rejected.  In the absence of such an indication, the reviewing court cannot tell if significant probative evidence was not credited or simply ignored.").

**D.   Credibility Determinations**

Plaintiff also asserts that the ALJ improperly discredited plaintiff's testimony and subjective complaints.  The statute requires deference to the ALJ's findings of fact so long as those findings are supported by substantial evidence of record. Monsour Med. Ctr. v. Heckler, 806 F.2d 1185, 1190-91 (3d Cir. 1986).  Although "[a]n ALJ must give serious consideration to claimant's subjective complaints of pain," Mason v. Shalala, 994

F.2d 1058, 1067 (3d Cir. 1993), subjective complaints of pain "do not in themselves *constitute* disability." Green v. Schweiker, 749 F.2d 1066, 1070 (3d Cir. 1984). Subjective complaints of pain are given "great weight" unless there is conflicting medical evidence. See Mason, 994 F.2d at 1067-68. When a claimant's subjective complaints of pain indicate a greater severity of impairment than the objective medical evidence supports, the ALJ can give weight to factors such as physician's reports and claimant's daily activities. See 20 C.F.R. § 404.1529(c)(3) (1995).

With regard to plaintiff's credibility, the ALJ stated that "[t]he record fails to provide any objective medical evidence that the claimant's impairments are as severe as her hearing testimony indicates." (D.I. 11 at 21)  In support of his finding that plaintiff was not credible, the ALJ noted her ability to attend the hearing and answer questions; her lack of hospitalization for her impairments and purported lack of psychological counseling for her depression; and purported contradictions in plaintiff's testimony with evidence concerning her daily activities and providing care for her disabled daughter.  (Id.)

First, the ALJ stated:

If the claimant genuinely had the level of pain and concentration asserted at the hearing, then she would not be unable [sic] to even attend the hearing, not to mention concentrate on and respond to questioning.

48

However, the claimant was able to sit through the one hour hearing without appearing to be in disabling pain. While the hearing was short-lived and cannot be considered a conclusive indicator of the claimant's overall level of pain on a day-to-day basis, the apparent lack of discomfort during the hearing is given some slight weight in reaching the conclusion regarding the credibility of the claimant's allegations and the claimant's residual functional capacity.

(Id.) Although the ALJ states that plaintiff's hearing comportment is given "some slight weight," the Third Circuit has criticized an ALJ's determination of disability based on his or her observation of a plaintiff at the hearing. See Van Horn v. Schwieker, 717 F.2d 871, 874 (3d Cir. 1983) (reversing a determination of no emotional disability where "[t]he ALJ could only have reached his conclusion by relying solely on his own non-expert observations at the hearing-in other words, relying on the roundly condemned 'sit and squirm' method of deciding disability cases."); id. at 874 n.3 ("'In this approach, an ALJ who is not a medical expert will subjectively arrive at an index of traits which he expects the claimant to manifest at the hearing. If the claimant falls short of the index, the claim is denied.'" (quoting Freeman v. Schweiker, 681 F.2d 727, 731 (11th Cir. 1982) ("The ALJ's decision improperly suggests that unless the pain is visible to the ALJ at the hearing, it is proper to deny the claim."))). Based on this precedent, plaintiff's ability to sit through the hearing is "entitled to little or no weight." Van Horn, 717 F.2d at 874.

49

Next, the ALJ questioned plaintiff's credibility based on
the treatment she received for her impairments.  He stated that
"[t]he record fails to show that the claimant had been
hospitalized for her impairments."  (D.I. 11 at 21)  Although the
ALJ is correct that plaintiff has not had surgery on her back, as
noted above, she did have surgery on her left foot and the record
indicates that she may have surgery on her right foot.  The ALJ
also stated that "the medical record [does not] indicate that the
claimant has or is receiving psychological counseling for her
depression . . . ."  (Id.)  As detailed above, this statement is
contradicted by the record which shows numerous visits by
plaintiff to Dr. Centers and therapists working under him at
CMHC.  Here, in addition to contradictory evidence in the record,
it appears the ALJ determined that plaintiff's subjective
complaints of pain were not credible by substituting his non-
expert opinion that the extent of discomfort she testified to
would require back surgery.

Finally, the ALJ questioned plaintiff's credibility based on
her daily activities and care for her disabled daughter.  The ALJ
specifically cited Dr. Wilson's April 23, 2004 office record
which states that plaintiff "does a lot of lifting on her
retarded daughter and does not have any help at home.  As a
result, all her daughter's care is provided by the claimant."
(Id. at 21, citing id. at 286)  However, the ALJ does not explain

50

why that citation demonstrates a lack of credibility on the part of plaintiff where other portions of the record support plaintiff's hearing testimony that she "can't lift at all, so I have to try to catch people when they come by [to help lift her daughter]." (Id. at 308)[4]

Apart from Dr. Wilson's April 23, 2004 office record concerning care for plaintiff's daughter, the ALJ stated that "[t]he claimant has described daily activities which are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations. The overall evidence suggests that the claimant has the ability to care for herself and her handicapped daughter and maintain her home." (Id. at 21)

It is the responsibility of the ALJ to weigh the evidence and make determinations on contradicting evidence. However, if contradicting evidence is in the record, the ALJ must explain how he came to his conclusions. Furthermore, the ALJ must explain what evidence was discounted as opposed to merely ignoring the evidence. For further discussion on these issues both related to plaintiff's residual functional capacity and her credibility, the case is remanded.

---

[4] See, e.g., id. at 197, Dr. Mow's September 8, 2003 office record stating that "patient has a lot of help for her daughter"; id. at 254, Dr. Wilson's November 12, 2002 office record stating that plaintiff reported "that she is unable to lift anything or the pain becomes severe"; id. at 242, Dr. Wilson's April 30, 2003 office record stating that plaintiff "[i]s unable to lift anything at home."

**E.    Vocational Expert**

Plaintiff also argues that the ALJ's hypothetical question to the vocational expert, Arthur M. Brown, failed to include all of plaintiff's limitations as she testified to them, e.g., the "sit and stand every 30 minutes" element of the ALJ's hypothetical question. "A hypothetical question must reflect all of a claimant's impairments that are supported by the record; otherwise the question is deficient and the expert's answer to it cannot be considered substantial evidence." Chrupcala v. Heckler, 829 F.2d 1269, 1276 (3d. Cir. 1987).

Despite plaintiff's contention that the ALJ did not include all of her subjective complaints in his hypothetical question, plaintiff's attorney asked Brown if he were to assume the facts the ALJ listed and "if you also assume that because of pain and depression [plaintiff] one day a week would not be able to work, would you agree with that hypothetical there wouldn't be any jobs available for her in the economy on an everyday basis." (D.I. 11 at 336) Brown opined that "if a person misses work one day a week on an unscheduled basis, then the person would exceed what would be considered normal work tolerances" and agreed that, if plaintiff's testimony were credible, there would be no jobs available for her within the national economy. (Id.) With regard to plaintiff's argument that there was no testimony concerning jobs with a sit and stand option, the ALJ did ask the

plaintiff whether she could work at a job where "they let you get
up once in awhile," to which she answered "I don't think so."
(Id. at 314)

As plaintiff stated in her brief in support of her motion
for summary judgment concerning the adequacy of Brown's
testimony, "[t]he real issue in this case is whether or not the
testimony of [plaintiff] is credible."  (D.I. 14 at 25)  Having
determined that the ALJ must further explain his credibility
determination, the court does not find a remand on the issue of
the vocational expert's testimony is warranted.

## IV.  CONCLUSION

The court has concluded that remand is the most appropriate
outcome, based on the record presented and the ALJ's treatment of
such.  The court notes in this regard that there are
inconsistencies between the objective medical findings, the
subjective complaints of pain, and the reports of plaintiff's
treating physicians, particularly in connection with the
interplay between plaintiff's physical and mental condition.
While the court is not convinced that plaintiff is disabled,
neither is the court satisfied with how the ALJ explained his
finding of disability.

An order shall issue.